IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PAUL BUSCH, ) | CASE NO. 8:05CV189 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | MEMORANDUM |
| ) | AND ORDER |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  The Court has carefully considered the record and the parties' briefs (Filing Nos. 30, 31).

## PROCEDURAL BACKGROUND

The Plaintiff, Paul Busch, filed his initial application for disability benefits on October 25, 2002.  (Tr. 61-63.)  The claim was denied initially and on reconsideration.  (Tr. 27, 44-53.)  An administrative hearing was held before Administrative Law Judge ("ALJ") Sherwin Biesman on June 2, 2004.  (Tr. 381-559.)  On August 18, 2004, ALJ Biesman issued a decision finding that Busch was not "disabled" within the meaning of the Act and therefore is not eligible for disability benefits.  (Tr. 21.)  On March 4, 2005, the Appeals Council denied Busch's request for review.  (Tr. 6-10.)  Busch appealed to this Court, which on August 9, 2005, granted the Commissioner's motion to remand the case under sentence six of 42 U.S.C. § 405(g) for further administrative proceedings.  In doing so, this Court retained jurisdiction.  (Filing No. 12.)  A supplemental hearing was held on January 30, 2006, before ALJ Jan Dutton.  (Tr. 560-607.)  On February 15, 2006, ALJ Dutton issued

a decision concluding that Busch is not entitled to disability benefits. (Tr. 254-66.) On October 2, 2007, the Appeals Council denied Busch's request for review. (Tr. 608-10.) Busch now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1.) It should be noted that the relevant period under consideration is between May 15, 1999, the date of the alleged onset of disability, and December 31, 1999, the date last insured for Title II benefits. (Tr. 255.)

Busch argues that the ALJ's decision was incorrect because the ALJ erred as follows: 1) the residual functional restrictions are inconsistent with the medical evidence; 2) the hypothetical question posed to the vocational expert did not contain the restrictions supported by the medical evidence; and 3) the ALJ failed to determine whether the vocational expert's testimony was consistent with the Department of Labor's Dictionary of Occupational Titles ("DOT"). (Filing No. 30, at 16.)

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Busch is now 61 years old. He was 52 years old at the time of the alleged onset of his disability, May 15, 1999, based on Huntington's Chorea ("Huntington's" or "Huntington's Disease"). (Tr. 61, 69.) Busch earned a two-year college business degree. (Tr. 387.) His occupational experience includes work as a real estate appraiser/home inspector, an owner of a furniture store, and district and regional director of a Pamida store.

(Tr. 78.)  Since May 1, 1999,  Busch has not engaged in any substantial gainful employment.  (Tr. 70.)

*Busch's Testimony*

At the hearing on June 2, 2004, Busch testified to his educational background and that he worked in management for fourteen years.  (Tr. 387-88.)  He also stated that the records submitted by his attorney accurately reflect his work history and his physical complaints.  (Tr. 388.)  At the January 30, 2006, hearing,  Busch stated that he was a self-employed real estate appraiser in 2002.  (Tr. 582.)  He stated that he stopped driving in 2003.  (Tr. 587.)[1]

After being placed under oath at the 2006 hearing,  Busch testified that in 2002 he conducted about 100 home inspections, and "a few" in 2003.  He stated that he stopped because of problems associated with Huntington's.  (Tr. 594.)

*Medical Expert's Testimony*

At the January 30, 2006, hearing, Dewey K. Ziegler, M.D., a neurologist at the University of Kansas Medical Center, testified as a medical expert that Huntington's Chorea falls within a neurologist's expertise.  (Tr. 576.)  As of the hearing date, Dr. Ziegler had served as a medical expert for approximately four years.  (Tr. 576-77.)  Dr. Ziegler had reviewed: medical records contained in Exhibits 1 through 4F;  Busch's IQ score of 91; and letters from third parties describing anecdotal information.  (Tr. 577.)  Dr. Ziegler testified that, although he had not personally visited with or evaluated Busch, those items provided him with a sufficient basis upon which to form an opinion.  (Tr. 576-77.)  Dr. Ziegler stated

---

[1] Busch was not under oath when he made these statements.

3

that prior to December 1999, Busch had Huntington's Chorea and no other impairments. Dr. Ziegler opined that before December 1999, Busch "definitely showed evidence of disease and that he was making mistakes in his, gross mistakes in his usual occupation as architect, and was having difficulty in interpersonal relations, which is not uncommon." (Tr. 578.) Dr. Ziegler stated that those symptoms corroborated the anecdotal information submitted through letters. (*Id.*) Dr. Ziegler stated that the relevant listing in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings," is 12.02, relating to organic mental disorder. (*Id.*) Dr. Ziegler opined that Busch's impairments did not meet Listing 12.02, noting that a report of a October 8, 2002, neurology consultation authored by Harris A. Frankel, M.D. showed that Busch was independent in his daily living activities, handling his own finances, and able to do chores at home. (Tr. 578-79.) Dr. Ziegler testified that Dr. Frankel noted some chorea form movements[2] in October 2002 and stated that Busch might have had Huntington's Chorea in 1999, although medical records did not support that conclusion. Dr. Ziegler noted that before October 2002 Busch's records contained no evidence of symptoms associated with the disease. (Tr. 579-80.)

Assuming for the sake of argument that Busch experienced chorea form movements in 1999, Dr. Ziegler stated that Busch could not have performed any work requiring careful finger movements, such as assembly. However, Busch would have been able to handle larger objects. (Tr. 581.) Dr. Ziegler testified that Busch's judgment would have been impaired but that he would have been capable of performing unskilled, repetitive work.

---

[2]Chorea form movements refers to movement in the hands, feet or trunk. (Tr. 581.)

4

However, he would not have been able to work in the fields of real estate or architecture. (Tr. 582.)

Dr. Ziegler heard the testimony of Joan Busch, the claimant's wife, and stated that her testimony did not change his opinions. (Tr. 597.)  Viewing Listing 12.02, Dr. Ziegler opined that Busch had no restrictions of activities of daily living in 1999. (Tr. 597-98.)  Dr. Ziegler did see the following limitations: mild difficulties in maintaining social functioning based on Busch's problems performing his job (Tr. 598); moderate limitations in concentration, persistence and pace and no episodes of deterioration or decompensation (Tr. 599); mild difficulty interacting with the public (Tr. 600); moderate difficulty interacting with the supervisor (Tr. 600); moderate difficulty completing tasks on time (Tr. 600); moderate to severe ability to keep pace in a job requiring quotas (Tr. 601); and slight to moderate difficulty reacting to changes in the work setting (Tr. 601).  In summary, Dr. Ziegler opined that in 1999 Busch was capable of performing simple, routine, unskilled work if the work was a one- or two-step procedure performed repetitively and not requiring job changes. (Tr. 602.)  In Dr. Ziegler's opinion, Busch could frequently work with the public and under regular supervision. (Tr. 602-03.)  Dr. Ziegler explained that quotas would not have been a problem in unskilled work; however, they would have caused difficulty in Busch's last occupation. (Tr. 603.)

### *Joan Busch's Testimony*

Busch's wife, Joan Busch, testified that Busch's brother and mother had Huntington's Chorea and that Busch's suspicion that he had the disease led him to see Dr. Frankel in 2002.  Busch had not previously sought medical advice regarding Huntington's. (Tr. 586.)  Ms. Busch noticed minor physical changes before 2002, but she

5

was not acquainted with the cognitive effects of the disease and was unaware of any such changes during that time frame. (Tr. 587.) She testified that he stopped driving in 2003 due to Huntington's. He continued to perform real estate appraisals until 2002, doing only a "handful" of them in 2002. (Tr. 588-89.) Ms. Busch testified that Busch did not handle household finances after 1995, and in 1999 he operated on a cash only basis. (Tr. 589-90.) Ms. Busch stated that when they last built a house, Busch had problems gripping things and could not do the work himself. (Tr. 590-91.) At that time Busch also experienced problems with his gait. (Tr. 591.) Ms. Busch testified that Busch stopped doing appraisals in 2000 when Dan Wilder stopped assisting him.[3] (Tr. 592.) Ms. Busch stated that Busch worked as a home inspector in 2002. (Tr. 593.)

Ms. Busch testified that Busch rarely saw a doctor between 1996 and 2002 because he had no health problems. (Tr. 595.) She stated, in contrast to Busch's testimony, that he did perform only between five and ten home inspections in 2002 and none in 2003. (Tr. 595-96.)

***Vocational Expert's Testimony***

Testimony was also heard from a vocational expert ("VE"), William B. Tucker, under contract with the Social Security Administration ("SSA").[4] (Tr. 604-06.) The VE was asked to consider a hypothetical claimant with the following characteristics:

---

[3] In a letter dated January 27, 2004, Wilder wrote Busch's attorney and stated that he coached Busch when Busch obtained his real estate appraiser's license between late 1998 through mid-2000. Wilder stated that in mid-1999 he saw problems in a house that Busch had appraised, finding incorrect measurements and other data. In another instance, Busch included incorrect sale prices in an appraisal. (Tr. 310.)

[4] Mr. Tucker's resume is in the record. (Tr. 420-22.)

6

–having no standing, sitting, or walking limitations;

–able to frequently finger and constantly handle larger objects;

–a need to avoid ladders, ropes and scaffolds;

–having the residual functional capacity to perform simple, routine, repetitive work at the SVP (Specific Vocational Preparation) level of one or two;

–able to perform work not requiring quotas or a rapid production pace;

–able to perform work that does not require goal-setting or dealing with changes in the job setting;

–able to work with ordinary supervision; and

–able to have social interaction up to a frequent basis.

(Tr. 605.)

With those limitations, Busch's present work is precluded. However, the VE testified that Busch could work, for example, as a laundry folder, an industrial cleaner/janitor, or a motel cleaner. All of those jobs exist in significant numbers in the Nebraska and national economies. (Tr. 605-06.) The VE also testified that, if the testimony of Busch and his wife would be considered credible, those positions would not be ruled out. And finally, considering Dr. Ziegler's testimony, these jobs also would not be ruled out. (Tr. 606.)

***Documentary Evidence Before the ALJ***

In addition to oral testimony, the ALJ considered documentary evidence. The record reveals that Busch worked as a district manager and regional director of Pamida stores from January 1975 through December 1989. From January 1990 through December 1993, Busch operated a furniture store. From January 1994 through May 1999, Busch worked as an appraiser and home inspector. (Tr. 70.)

During his employment as a real estate appraiser and home inspector, Busch received only occasional medical treatment for complaints unrelated to Huntington's. For example, on July 21, 1995, Busch was seen by his primary-care physician, Steven M. Williams, M.D., for a swollen knee that was diagnosed as monoarticular arthritis. (Tr. 359.) On December 17, 1996, Busch saw Manju Hapke, M.D., for sinusitis. (Tr. 358.) Busch stopped working full-time in May 1999, and he now alleges disability since that time. However, he did not seek medical treatment from December 1996 until July 2000. In July 2000, Dr. Williams saw Busch with complaints of groin swelling. (Tr. 344.) On July 18, 2000, Busch had surgery to repair his bilateral hernias. (Tr. 342.) After the surgery, Busch did not seek treatment again until August 23, 2001, when Robert A. Beer, M.D., saw Busch for an upper respiratory infection and prescribed Amoxicillin. (Tr. 339.) On September 5, 2001, Busch returned to Dr. Beer for complaints of erectile dysfunction. Dr. Beer noted that Busch "appear[ed] healthy but ha[d] some unusual nervous twitches," had no edema and good muscle strength and tone in his extremities. Dr. Beer assessed erectile dysfunction and recommended that Busch start a trial of Viagra. (Tr. 337.)

The first treatment record referencing a possible diagnosis of Huntington's Chorea is dated September 24, 2001, almost two full years after the expiration of Busch's insured status. (Tr. 64, 331-34.) On that date, Busch returned to Dr. Williams requesting evaluation. Busch told Dr. Williams that his mother and brother both suffered from Huntington's. He reported having some "mild chorea, beginning with some subtle fidgeting." (Tr. 333.) Busch further reported having "frequent, irregular, sudden jerks and movements of the legs," as well as some "mild facial grimacing," a somewhat "labored" gait, decreased coordination, a flat affect, and intermittent memory problems. Busch's

8

symptoms of Huntington's were described as "slowly progressive" but not yet "debilitating." (Tr. 333.) Busch stated that his main exercise was playing golf. (Tr. 332.) Busch showed a good range of motion throughout, with all muscle groups working symmetrically. His gait, however, was "somewhat overemphasized," and he had "some grimacing noted with some chorea motion of the hands and legs." (Tr. 331.) Dr. Williams assessed "[p]ossible Huntington's chorea, with memory loss" and noted the possibility of a referral for a second opinion from a neurologist. (Tr. 331.)

Meanwhile, Busch testified at the January 2006 hearing that he continued to work part-time throughout 2002 doing home inspections. Busch stated that he did approximately 100 home inspections during 2002, charging $250 per inspection. (Tr. 594.) Busch's wife, however, testified that he did only between five and ten inspections in 2002. (Tr. 595-96.)

On October 8, 2002, Busch saw Harris A. Frankel, M.D., for a neurological evaluation. (Tr. 328-29, 555.) Busch told Dr. Frankel that he was suffering from chorea form movements affecting his head and extremities, and that he had been symptomatic for the previous year. However, Busch denied any intellectual impairment or psychiatric symptoms. He also denied having any headache, disturbance of vision, speech or swallowing difficulty, focal motor weakness, sensory complaints, or limb incoordination. (Tr. 328.) He reported that he was independent with his activities of daily living, continued to work, could handle his own finances, and did some household chores. (Tr. 328-29.) On examination, Busch was not in acute distress. While he was alert and oriented, he had some difficulty with serial sevens and his speech showed some irregular cadence. He was not suffering from any aphasia or frank dysarthria. Although Dr. Frankel noted that Busch's gait showed "a bit" choreiform movement of his trunk and lower limbs and that Busch was

9

"a bit" slow when performing rapid alternating movements with either hand, Busch had normal muscle strength in all extremities. Busch ambulated independently. He had no difficulty with heel, toe, or tandem walking. (Tr. 329.) Dr. Frankel opined that Busch had Huntington's disease, but that his disease was, at that time, "relatively mild." (Tr. 328.)

On November 12, 2002, Busch completed a Daily Activities and Symptoms Report in which he stated that during a typical day he watched television, read, and did inside and outside household chores. Busch wrote that he independently cared for his personal needs. He was still able to vacuum, dust, scrub floors, sweep the sidewalk, get the mail, rake leaves, and garden. (Tr. 291.) He also stated that he could run errands including getting the mail, shopping, and taking out the garbage. (Tr. 292.)

Busch's attorney submitted additional evidence to the Appeals Council. (Tr. 611-43.)

## THE ALJ'S DECISION

The ALJ found that Busch was not "disabled" at any time through December 31, 1999. (Tr. 265.) The ALJ framed the issues as: 1) whether Busch was entitled to disability benefits under the Act; and 2) whether Busch was "disabled" during the relevant time period. (Tr. 254.)

The ALJ followed the sequential evaluation process set out in 20 C.F.R. § 404.1520 to determine whether Busch was disabled, considering any current substantial gainful work activity, the severity of any medically determinable impairment(s), and Busch's residual functional capacity with regard to his ability to perform past relevant work or other work that exists in the national economy. (Tr. 256.)

Following this analysis, the ALJ found that Busch was not disabled during the relevant time period. (Tr. 265.) Specifically, at step one the ALJ found that Busch did not perform any substantial gainful activity during the relevant period. At step two, the ALJ found that Busch had the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: early signs of Huntington's disease; and an organic brain disorder. At step three, the ALJ found that Busch's medically determinable impairments, either singly or collectively, did not meet or equal any impairment listed in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 256, 265.) The ALJ noted the following: Busch did not seek treatment for Huntington's disease prior to December 1999; the record shows no symptoms of Huntington's prior to December of 1999; and he was not diagnosed until October 2002 with mild Huntington's. (Tr. 258-59.) At step four, the ALJ determined that Busch is unable to perform any of his past relevant work. (Tr. 261, 266.) Finally, at step five the ALJ found that Busch has the residual functional capacity to perform the following jobs that exist in significant numbers in the local and national economies: laundry folder; cleaner/janitor; and motel cleaner. (Tr. 265-66.) In so deciding, the ALJ weighed Busch's testimony, finding the testimony relating to his ability to work "not totally credible." (Tr. 265.) The ALJ also carefully considered the medical records submitted by treating physicians, third party reports regarding Busch's prior work, the opinions of consultative physicians, and the entire hearing record.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d

529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner

to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

**SEQUENTIAL EVALUATION**

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 404.1520. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding the following: during the relevant period, Busch did not perform any substantial gainful activity; during the relevant period, Busch had early signs of Huntington's disease and an organic brain disorder, both being the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations; Busch's medically determinable impairments, either singly or collectively, do not meet or equal any impairment listed in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4 ("listings"); Busch is unable to perform any of his past relevant work; and Busch has the residual functional capacity to perform the jobs of laundry folder, cleaner/janitor and motel cleaner, all of which exist in significant numbers the local and national economies.

The issues in this case are whether: 1) the ALJ's residual functional capacity determination is supported by substantial evidence; 2) the ALJ's hypothetical posed to the VE included all of Busch's limitations; and 3) remand is necessary because the VE did not state that his testimony was consistent with the DOT. (Filing No. 30, at 2; Filing No. 31, at 8, 11, 13.)

**RESIDUAL FUNCTIONAL CAPACITY**

Residual functional capacity is defined as what Busch "can still do despite [his] limitations." 20 C.F.R. § 404.1545(a). Residual functional capacity is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of relevant limitations. *Id.* § 404.1545(a)-(c).

The ALJ must determine residual functional capacity based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of relevant limitations. *McKinney,* 228 F.3d at 863-64. Before determining residual functional capacity, an ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* § 404.1529 (evaluation of pain). Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski,* 739 F.2d at 1322.  A lack of work history may indicate a lack of motivation to work rather than a lack of ability.  *See Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir. 2001).

In this case, although the ALJ stated the following: "Even though each "Polaski factor" has not been cited in detail in this written decision, the undersigned has recognized and considered the requisite and analytical framework." (Tr. 259-60 (citing *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir. 1996).)  The ALJ summarized Busch's allegations of pain and described his daily activities according to the testimony and documentary evidence. (Tr. 260-64.)  The ALJ found Busch's testimony "not totally credible."  (Tr. 265.)  The ALJ specifically considered, in addition to Busch's testimony, documentary evidence including reports of treating and consultative physicians and the testimony of medical and vocational experts.  The medical expert ("ME") noted that Busch did not seek treatment from any medical specialist or hospitalization before December 1999 and that no treating physicians reported any symptoms consistent with a severe impairment prior to December 1999. The VE opined that Busch has the residual functional capacity to perform certain jobs that exist in significant numbers in the local and national economies.  The ALJ discussed in detail Dr. Frankel's opinion and the reasons why the opinion was not heavily weighted.  For example, the ALJ explained: Dr. Frankel did not examine Busch until 2002, three years after the date Busch was last insured; Busch exhibited only mild symptoms in 2002 and complained of symptoms only since 2001; and Dr. Frankel indicated no difficulties with daily activities.  (Tr. 258-59.)

In summary, for the reasons discussed, the Court concludes that the ALJ's decision regarding residual functional capacity is amply supported by substantial evidence.

**VOCATIONAL EXPERT'S HYPOTHETICAL**

Busch argues that the hypothetical posed to the VE "failed to capture the concrete consequences of Huntington's Chorea and the ALJ failed to evaluate all of he medical evidence. (Filing No. 30, at 22-27.) Busch claims that the hypothetical did not include Busch's handling limitations and mental limitations.

*Handling Limitations*

With respect to handling limitations, Busch narrows his argument further, stating that the hypothetical did not include the statement of the ME that "any kind of work involving careful finger movements would be impossible for him to do." (Filing No. 30, at 24-25 (referring to Tr. 581).) However, the ME's complete testimony is as follows:

> A    Well, I don't think, it's certainly probable that he had the Corea [sic] form movements in 1999, but we don't, we don't have any current evidence for it.
> . . . .
> A    . . . . He obviously if he had [sic] Corea [sic] form movements, then as I say we have to assume that he did. We don't have any evidence for it. But if he had Corea [sic] form movements, any kind of work involving careful finger movements would be impossible for him to do.

(Tr. 580-81.)

Clearly, as the ME pointed out, all work involving careful finger movements would have been precluded if Busch had Chorea form movements during the relevant time period, and the record shows no evidence of Chorea form movements during that time period. Finally, Busch's argument is moot since the jobs suggested by the VE only require "occasional" fingering. DOT, No. 369.687-018 (1991) (folder); DOT, No. 381.687-018

(janitor); DOT, No. 323.687-014 (cleaner, housekeeper). Therefore, the hypothetical properly did not exclude all work requiring careful finger movements.

### *Mental Limitations*

The hypothetical included the following mental limitations:

he is able to perform simple, routine, repetitive work at the SVP one or two level, work that does not require quotas or rapid production pace, and work that does not require him to set goals or deal with changes in the job setting. He would have ordinary supervision and could handle social interaction that is up to the frequent basis. Certainly he could handle brief, superficial social interaction.

(Tr. 605.)

Busch argues that the hypothetical does not include the following limitations which Busch attributes to the ME: moderate to severe difficulty keeping pace if quotas are required; moderate difficulty completing tasks on time; slight to moderate interference with ability to react to changes in work setting; moderate difficulty interacting with a supervisor; and mild difficulty working with the public. (Filing No. 30, at 26.)

The ME testified that Busch could have handled: frequent interaction with the public (Tr. 602); regular supervision (Tr. 603); and quotas with unskilled work (Tr. 603). The hypothetical was specifically limited to unskilled work. (Tr. 605.) Therefore, the hypothetical mirrored the mental limitations suggested by the ME. Busch's argument is without merit.

### *Vocational Expert/DOT*

The ALJ stated that "the vocational expert testified that his opinion was evaluated under the relevant parts of SSR 00-4p and is consistent with the requirements found in the [DOT]." (Tr. 265.) However, as Busch correctly points out, the VE's testimony included

17

no such statement. (Tr. 604-06.) Busch then argues that discrepancies exist when the jobs identified by the VE are compared to their descriptions in the DOT. As Busch states in his brief, a job requiring a GED (General Educational Development) level one reasoning[5] requires the ability to carry out simple instructions. *Riggs,* 2008 WL 1927337, at 16 (quoting *Meissl v. Barnhart,* 403 F. Supp. 2d 981, 983-85 (C.D. Cal. 2005)). Busch argues that the hypothetical did not specify a GED reasoning level one but rather included an SVP (Specific Vocational Preparation) level one or two categorization.[6] (Filing No. 31, at 12.)

In considering a similar argument, the Eighth Circuit stated:

[The Plaintiff's] "reliance on the DOT as a definitive authority on job requirements is misplaced, however, for DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT. The record in the present matter, including the testimony of the vocational expert, who answered a hypothetical that included [the Plaintiff's] limitations, supports the ALJ's conclusion that [the Plaintiff] could perform certain available jobs within the economy.

*Wheeler v. Apfel,* 224 F.3d 891, 897 (8th Cir. 2000) (citations omitted).

Similarly, in Busch's case the record that includes the VE's testimony shows that Busch was, during the applicable time period, able to perform at least three jobs available in significant numbers in the local and national economies within the limitations set out in

---

[5]The GED framework includes six levels of reasoning ability and addresses the complexity of a job. *Riggs v. Astrue,* 2008 WL 1927337, at *15 (W.D. Apr. 25, 2008); *Smith v. Astrue,* 2008 WL 879380, at *8 (M.D. Fla. Mar. 28, 2008).

[6]The SVP measure includes nine levels and addresses the types of skills required for a job. For example, levels one and two include unskilled work. *Gonzalez-Amezcua v. Astrue,* 2008 WL 1859997, at *3 n.1 (N.D. Cal. Apr. 24, 2008).

the hypothetical. The DOT is a nonbinding generic guideline. Therefore, Busch's argument fails.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 4th day of June, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge